UNITED STATES COURT OF APPEALS
**Filed 3/26/96**TENTH CIRCUIT

_____

JOHN E. AIKEN,                                      )
                                                   )
      Plaintiff-Appellant,                     )
                                                   )
    v.                                         )        No. 95-3196
                                                   )    (D.C. No. 94-CV-2199)
EMPLOYER HEALTH SERVICES, INC.,                    )        (D. Kan.)
fka The Business and Industry Health Group, Inc.,  )
                                                   )
      Defendant-Appellee.                      )

_____

ORDER AND JUDGMENT[*]
_____

Before PORFILIO, KELLY, and BRISCOE, Circuit Judges.

_____

Plaintiff John E. Aiken, a physician and former employee of defendant The

Business and Industry Health Group, Inc., filed this diversity action claiming he was

wrongfully discharged from his employment, in violation of public policy and in breach

of an implied covenant of good faith and fair dealing. The district court granted summary

judgment in favor of defendant and plaintiff appeals. For the reasons set forth below, we

affirm.

Defendant Employer Health Services, Inc., is a Missouri corporation whose

operating division, The Business and Industry Health Group, Inc., (BIHG) operates

occupational medicine clinics in a number of states, including Kansas and Missouri.

Companies hire BIHG to provide occupational medicine services for employees who

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of
the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders
and judgments; nevertheless, an order and judgment may be cited under the terms and conditions
of 10th Cir. R. 36.3.

suffer work-related injuries.

Plaintiff entered into an employment contract with BIHG on August 25, 1985, and moved from Oklahoma to Kansas City, Missouri. Soon thereafter, he was assigned to a clinic in Johnson County, Kansas, and he moved to Kansas. In 1986, BIHG assigned plaintiff to work at its Fairfax Clinic in Wyandotte County, Kansas. Plaintiff worked at the Fairfax Clinic until December 1992, when he was transferred to the Indian Springs Clinic in Wyandotte County. On July 1, 1993, BIHG placed plaintiff on "float" status, which required him to rotate through BIHG's clinics in Kansas and Missouri. Plaintiff remained on float status until his employment was terminated in January 1994.

From 1985 through 1990, plaintiff received satisfactory performance reviews and regular salary increases. However, following the October 1990 installation of Roger Crain, an accountant, as CEO of BIHG, plaintiff began to experience problems. According to plaintiff, Crain's emphasis in running BIHG was profitability and plaintiff's performance reviews began to include an emphasis on the number of patients he saw and revenue generated. In addition, plaintiff claims that BIHG suddenly began to criticize him for prescribing medical leave for people whom he believed should not be working due to their injuries. Plaintiff claims that after his transfer to the Indian Springs Clinic, BIHG began to place increasing pressure on him to stop placing patients on medical leave.

BIHG's decision to move plaintiff to float status was apparently motivated by complaints from clients regarding plaintiff's decisions to place patients on medical leave. In a memo to plaintiff, BIHG President Peggy Walker and plaintiff's supervisor, Dr. Eugene Welter, noted that the "lost time days" attributed to plaintiff were "far in excess

2

of any of our system physicians." Appellant's append. at 146. The memo further urged plaintiff to "review [his] current practices in regard to time off." Id. The memo indicated that BIHG would continue to monitor plaintiff's performance and, if additional complaints were received, plaintiff's employment would be terminated.

On August 26, 1993, an incident occurred in which Dr. Welter disagreed with plaintiff's diagnosis of a patient. Although plaintiff had placed a permanent restriction on the patient, Welter instructed plaintiff to delete the restriction and counseled plaintiff about the problems with his diagnosis. On that same date, Dr. Welter verbally warned plaintiff that his employment would be terminated if BIHG continued to receive complaints about his performance.

On October 14, 1993, another incident occurred while plaintiff was working at BIHG's Panorama Park Clinic. Specifically, a patient suffering from a traumatic injury was brought into the clinic at 4:25 p.m., and the transporting paramedic informed plaintiff and the other physician on duty of the patient's arrival and need for care. At 4:30 p.m., both plaintiff and the other physician left the clinic by the back door without seeing the patient. Although the clinic coordinator attempted to stop them, both physicians refused to see the patient.

On November 2, 1993, while plaintiff was working as a "floater" in one of BIHG's Missouri clinics, Dr. Welter delivered a memorandum to plaintiff invoking the 90-day notice provision in plaintiff's employment agreement, and informing plaintiff that his employment with BIHG would terminate on January 31, 1994. The memorandum stated that the action was "prompted by an episode at Panorama Park clinic the week of October 11th in which you left the clinic at 4:30 p.m. after having been informed that a patient still

3

needed to be cared for." Appellee's supp. append. at 223. According to plaintiff, Welter also informed him that he was being terminated because: (1) he "put too many people off work"; and (2) because Roger Crain (the president of BIHG) "hated [his] guts." Appellant's append. at 83.

The district court granted summary judgment in favor of BIHG on both claims asserted against it by plaintiff. We review the district court's grant of summary judgment de novo, applying the same standard as the district court under Fed. R. Civ. P. 56(c). Universal Money Centers v. American Tel. & Tel., 22 F.3d 1527, 1529 (10th Cir.), cert. denied, 115 S.Ct. 655 (1994). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We examine the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party. Id. If there is no genuine issue of material fact in dispute, we must determine whether the district court correctly applied the law. Applied Genetics, Intern. v. First Affiliated Securities, 912 F.2d 1238, 1241 (10th Cir. 1990).

## A. Choice of law

Federal courts sitting in diversity must apply the substantive law, including choice of law rules, of the state in which they sit. Robert A. Wachsler v. Florafax Intern., 778 F.2d 547, 549 (10th Cir. 1985) (citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941)). Accordingly, we look to Kansas law to determine which state's law to apply to each of plaintiff's claims.

In tort actions, Kansas follows the lex loci delicti approach of the First

Restatement, which means the law of the "place of the wrong" controls. Brown v. Kleen Kut Mfg. Co., 714 P.2d 942, 944 (Kan. 1986); Ling v. Jan's Liquors, 703 P.2d 731, 735 (Kan. 1985). The "place of the wrong" is that place where the last event necessary to impose liability took place. Id.; see also Restatement of Conflicts § 377 (1934).

Here, the uncontroverted evidence indicates that Dr. Welter, plaintiff's supervisor, delivered the termination notice to plaintiff at a clinic in Missouri and discussed it with plaintiff. Because damages "were caused and began to accrue upon plaintiff's receipt of notice that he was being terminated," Johnston v. Farmers Alliance Mut. Ins. Co., 545 P.2d 312, 316 (Kan. 1976) (holding that cause of action for retaliatory discharge accrued, for statute of limitations purposes, at time employee was called into supervisor's office and employment terminated), we conclude the "place of the wrong" was Missouri. Accordingly, we must apply Missouri law to plaintiff's wrongful discharge claim.

In reaching this conclusion, we recognize that application of the traditional lex loci delicti approach may, in some instances, result in application of the law of a state that has little connection with the underlying cause of action. In such instances, it is conceivable that the Kansas courts would allow a reviewing court to go beyond the traditional approach and consider other factors, such as those listed in Restatement (Second) of Conflicts of Laws § 145(2) (1971). See, e.g., Hager v. National Union Elec. Co., 854 F.2d 259, 261-62 (7th Cir. 1988) (although Indiana courts adhere to the traditional lex loci delicti approach, they allow consideration of other factors where application of traditional approach would produce anomalous results); Oakes v. Oxygen Therapy Services, 363 S.E.2d 130, 131-32 (W.Va. 1987) (modifying lex loci delicti rule in case involving claim of retaliatory discharge). However, because Missouri has more than a

5

passing connection with the employment relationship between plaintiff and BIHG, we find it unnecessary at this time to predict whether the Kansas courts would approve this "modified lex loci delicti" approach.

As for plaintiff's breach of contract claim, Kansas courts adhere to the lex loci contractus theory of contract interpretation; under this theory, the law of the place where the contract was made governs construction of the contract. E.g., Frasher v. Life Investors Ins. Co. of America, 796 P.2d 1069, 1071 (Kan. App. 1990). Although no recent Kansas cases have discussed whether this theory applies in situations where the performance of a contract rather than its construction is at issue, several older Kansas cases indicate that issues concerning contract performance are instead governed "by the law prevailing at the place of performance." Sykes v. Citizens' Nat. Bank, 98 P. 206 (Kan. 1908) (quoting Scudder v. Union Nat. Bank, 91 U.S. 406, 412 (1875)); see also Alexander v. Barker, 67 P. 829 (Kan. 1902).

Reviewing the record on appeal in this case, it is uncontroverted that the last act necessary for formation of the employment contract between plaintiff and BIHG was the signing of the contract by plaintiff in Oklahoma. Thus, any issues relating to construction of the contract should be decided under Oklahoma law. See, e.g., Alexander & Alexander v. Feldman, 1996 WL 42054 at *5 (D. Kan. 1996); Simms v. Metropolitan Life Ins. Co., 685 P.2d 321, 324 (Kan. App. 1984). However, it is also uncontroverted that the contract was performed in Kansas and Missouri, but not Oklahoma. Thus, any issues relating to performance of the contract should be decided under either Missouri or Kansas law.

Plaintiff contends his claim for breach of implied covenant of good faith and fair

dealing is a question of performance that should be decided under Missouri law. In contrast, BIHG contends Oklahoma law applies to this claim. We agree with BIHG. Although we have been unable to find any Kansas cases directly addressing this issue, we believe the question of whether a contract of employment contains an implied covenant of good faith and fair dealing is a question of contract construction. See Magnan v. Anaconda Industries, 479 A.2d. 781 (Conn. 1984) (holding that implied covenant of good faith and fair dealing is "a rule of construction"); cf. Southwest Kansas Royalty Owners Ass'n v. State Corp. Com'n, 769 P.2d 1, 13 (Kan. 1989) (holding that "gas leases are construed to contain an implied covenant to reasonably develop the owner's land."); Simms, 685 P.2d at 324 (holding that "construction" of an insurance contract "includes a determination of whether statutorily mandated provisions are to be read into the policy"). Only after the existence of such a covenant is established does the issue of performance arise. Accordingly, we will apply Oklahoma law to plaintiff's claim for breach of implied covenant of good faith and fair dealing.

**B. Wrongful discharge**

Although Missouri is an employment-at-will state, Saffels v. Rice, 40 F.3d 1546, 1550 (8th Cir. 1994); Dake v. Tuell, 687 S.W.2d 191, 192-93 (Mo. 1985) (en banc), the Missouri appellate courts have adopted a limited public-policy exception to the at-will employment doctrine. See Luethans v. Washington University, 894 S.W.2d 169, 171 n.2 (Mo. 1995) (citing appellate decisions, but noting that exception has never been expressly adopted by Missouri Supreme Court). Under this narrow public-policy exception, it is unlawful for an employer to terminate an employee for (1) declining to violate a statute or

7

act contrary to public policy, (2) reporting violations of the law by employers or fellow employees, (3) engaging in conduct encouraged by sound public policy (e.g., accepting a call to jury duty), or (4) filing a workers' compensation claim. See Saffels, 40 F.3d at 1550; Boyle v. Vista Eyewear, 700 S.W.2d 859, 873-75 (Mo. App. 1985).

Here, plaintiff contends BIHG received complaints from its clients about the number of people plaintiff was placing on medical leave. In response to these complaints, plaintiff contends, BIHG "attempted to pressure or coerce [him] to authorize injured employees of those clients to return to work in spite of [his] professional medical judgment that they were medically unfit to return to work." Appellant's append. at 4. Plaintiff contends he was discharged after he refused, as requested by BIHG, to abandon his legal and ethical duties to prescribe care that was in the best interests of his patients. Plaintiff points to various sources, including Missouri statutes, professional codes of ethics for physicians, and the Hippocratic Oath, which he contends establish a physician's legal and ethical duty to faithfully serve the interests of his patients, and which he contends he attempted to fulfill in placing his patients on medical leave.

At the outset, we must decide within which of the four general categories of public-policy exceptions plaintiff's claim falls. Although the district court concluded plaintiff's claims fell within the second category, plaintiff argues the court misconstrued his complaint. In his appellate brief, plaintiff points to the third category, arguing he was discharged "for participating in acts public policy encourages." Appellant's br. at 19. Plaintiff's public policy claims are not a model of clarity. We conclude, however, that his claim fits more appropriately within the first category, i.e., discharge for refusal to violate a statute or act contrary to public policy. Notably, plaintiff has never alleged that he was

8

discharged simply for fulfilling his legal and ethical duties to his patients. Rather, plaintiff has consistently alleged in his complaint, in his response to BIHG's summary judgment motion, and on appeal that he was discharged for refusing to abandon these duties and violate Missouri statutes, various codes of ethics, and the Hippocratic Oath.

Under this public-policy exception, plaintiff must satisfy two requirements. Lay v. St. Louis Helicopter Airways, 869 S.W.2d 173, 176 (Mo. App. 1993). First, he must demonstrate that BIHG required him to engage in conduct that violated a statute, a constitutional provision, or a regulation adopted pursuant to statute, id., or that was contrary to public policy. Boyle, 700 S.W.2d at 873. Second, plaintiff must demonstrate that he was discharged for refusing to engage in the required conduct. Lay, 869 S.W.2d at 176.

We conclude that plaintiff has failed to present evidence sufficient to satisfy the first of these requirements. Consistent with plaintiff's allegations, the evidence in the record indicates that plaintiff was asked by BIHG to reduce the number of patients he placed on medical leave. However, there is no evidence in the record from which a finder of fact could conclude that, in complying with this request, plaintiff would have violated a statute, a constitutional provision, or a regulation, or would have acted contrary to public policy. More specifically, plaintiff has failed to produce sufficient evidence to allow a finder of fact to conclude that BIHG's request was medically unsound and, if followed, would have required plaintiff to violate his code of ethics, Missouri state law, or the Hippocratic Oath. We agree with the district court that "[t]he only evidence in the record in this case is that two apparently qualified doctors, plaintiff and Dr. Welter, differed in opinion with respect to patient care. Neither one asserts that the other's actions fell below

9

the acceptable standard of care of the profession, let alone that they amounted to gross or obvious misconduct." Memorandum and Order at 14. This failure of proof is fatal to plaintiff's claim regardless of whether his claim falls within the first, second, or third public policy exception delineated in Saffels.

Although plaintiff makes a blanket assertion that the conduct requested by BIHG would have violated one or more of the alleged sources of public policy, he fails to point to a single, specific instance to support this assertion. In the absence of such specific evidence, plaintiff essentially asks us to assume his diagnoses and treatment were correct, and that any variance would have been illegal or unethical. On a broader scale, plaintiff asks us to assume that any variance violates Missouri public policy. We refuse to make these assumptions.

Based upon the evidence before us, we agree with the district court that plaintiff's claim is analogous to the wrongful discharge claim rejected by the Missouri Court of Appeals in Lay. In Lay, plaintiff was a licensed helicopter pilot hired by the defendant to fly helicopter emergency service. Plaintiff refused to take three flights because of his "'sincere belief that it was too dangerous' under the weather conditions," and that taking the flights would have violated the "employer's operation manual, the 'Code of Ethics,' and the FAA Regulations." 869 S.W. 2d at 175. Plaintiff's employment was subsequently terminated for refusing to fly and for costing the defendant lost revenue. Id. Plaintiff filed suit against the defendant claiming he was wrongfully discharged. In rejecting plaintiff's claim, the court noted that neither the FAA regulations nor the code of ethics cited by plaintiff "impose[d] a duty on an employer to refrain from terminating a pilot whose judgment calls are contrary to the employer's judgment." Id. at 177.

In conclusion, we agree with the district court that Missouri would not recognize a public policy "which prohibits an employer from terminating a health care employee over a disagreement or difference of professional judgment where the judgment of each is within the bounds of reasonable care." Memorandum and Order at 15-16. Accordingly, we affirm the district court's dismissal of plaintiff's wrongful discharge claim.

Because plaintiff cannot demonstrate that the conduct requested by BIHG would have violated any Missouri statute, any code of professional ethics, or the Hippocratic Oath, it is unnecessary for us to decide whether the latter two sources are sufficient, under Missouri law, to establish a clear mandate of public policy. See generally Kalman v. Grand Union Co., 443 A.2d 728, 730-31 (N.J. Super. App. Div. 1982) (holding pharmacist's professional code of ethics was a source of public policy).

## C. Breach of duty of good faith and fair dealing

Oklahoma law does not recognize an implied covenant of good faith and fair dealing in employment-at-will contracts. Burk v. K-Mart Corp., 770 P.2d 24, 27 (Okla. 1989); see also Devery Implement Co. v. J.I. Case Co., 944 F.2d 724, 728-29 (10th Cir. 1991) (holding an implied covenant of good faith and fair dealing "cannot trump a bargained-for termination-at-will clause"); Pytlik v. Professional Resources, Ltd., 887 F.2d 1371, 1378 (10th Cir. 1989). Here, plaintiff does not appeal the district court's finding that he was an employee-at-will. Further, plaintiff's counsel conceded at oral argument that, notwithstanding the contract of employment with BIHG, plaintiff was an employee-at-will of BIHG. Accordingly, we conclude plaintiff's employment contract

11

with BIHG did not contain an implied covenant of good faith and fair dealing.

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge